UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID MICHAEL JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:23-cv-00444-TWP-MG |
| | ) |
| BRANDON GRANT Anderson Police, | ) |
| DARRON GRANGER Anderson Police, | ) |
| DUSTIN ARMSTRONG Anderson Police, | ) |
| NATE SMITH Anderson Police Officer, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Brandon Grant ("Officer Grant"), Darron Granger ("Officer Granger"), Dustin Armstrong ("Officer Armstrong") and Nate Smith ("Officer Smith") (collectively "Defendants") (Dkt. 74). Also pending is *pro se* Plaintiff David Michael Jones' ("Mr. Jones") Motion to Appoint Counsel (Dkt. 81), Defendants' Motion for Continuance (Dkt. 82) and Motion for Oral Argument (Dkt. 83). Mr. Jones filed this civil rights action alleging violations of his civil rights by the Anderson, Indiana police officers, who were involved in his arrest and prosecution. (Dkt. 1). He was acquitted of the felony charges made against him, and proceeds on Fourth Amendment claims against the officers alleging false arrest. (Dkt. 30 at 3). For the reasons explained in this Order, Defendants' motion for summary judgment is **granted** and the remaining motions are **denied** as moot**.**

**I.    LEGAL STANDARD**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the

1

Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.  FACTUAL BACKGROUND

Because Defendants moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Jones and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties and Non-Party Kaylie Shields

The Defendants are all officers with the Anderson Police Department. (*See* Dkt. 76-1, Dkt. 76-2, Dkt. 76-3, Dkt. 76-4).

Non-Party Kaylie Shields ("Ms. Shields") called 911 seeking help on the night of the incident that gave rise to the complaint, reporting that Mr. Jones was not allowing her to leave and had strangled her to the point where she could no longer breathe, (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). Mr. Jones and Ms. Shields met each other after he was released from prison, approximately six months before the events that gave rise to the complaint. (Dkt. 76-11 at 8-9.) Mr. Jones described their relationship as "drug addict friends," and that the two were involved in an ongoing sexual relationship since they met. *Id.* at 8-9.

### B.  Events that occurred on October 25, 2019

#### i.  911 call

On October 25, 2019, when Ms. Shields called 911 seeking help, the dispatch officer could hear yelling and screaming in the background. (Dkt. 76-1 at 13; Dkt. 76-2 at 2; Dkt. 76-2 at 15). Mr. Jones got on the phone and assured the dispatch officer that everything was okay, and the police did not need to come. *Id.* After dispatch asked several times to speak with Ms. Shields again, the phone went dead. *Id.* Dispatch called back several times but there was no answer. *Id.*

Officers Granger and Grant were dispatched to Ms. Shields' location in the Mounds Road Trailer park to investigate. (Dkt. 76-1 at 13; Dkt. 76-2 at 2). The two officers arrived on the scene at the same time. (Dkt. 76-1 at 14). As Officer Granger approached, Mr. Jones stepped out the door of a trailer. (Dkt. 76-2 at 15). Ms. Shields was standing in the doorway of the trailer screaming, and Officer Granger heard her yelling: "He is the one that done it, he is a murderer," and she wanted him charged. *Id.* Ms. Shields also yelled to Officer Grant, "Over here, I need help. He's been hitting me and choking me." (Dkt. 76-1 at 14). Mr. Jones walked toward Officer Grant who placed him in handcuffs and told him he was not under arrest but was being detained for everyone's safety pending investigation. *Id.* Officer Grant then patted Mr. Jones down and awaited further instruction

from Officer Granger, who had begun to speak with Ms. Shields who was bleeding from the chin and she had strangulation marks around her neck. *Id.*

### ii.  Mr. Jones' version of events of October 25, 2019

Mr. Jones' brother owned the trailer that he and Ms. Shields were in during the night in question—Mr. Jones had been staying there for about a month while his brother was in jail. (Dkt. 87 at 7-8). Ms. Shields had been staying with him in the trailer for a couple nights, after her boyfriend grabbed her around the neck and threw her up against a wall. *Id.* at 9.

On October 25, 2019, Mr. Jones went to bed around 1:00 a.m. and woke up to Ms. Shields packing stuff up that was not hers, so they "got into it." *Id.* at 10-11. Mr. Jones grabbed Ms. Shields and pushed her out the door, but she kept coming back into the house. *Id.* at 11. While in the trailer, Ms. Shields called someone, and it turned out to be 911. *Id.* Mr. Jones grabbed the phone and as he was attempting to talk to 911, Ms. Shields grabbed it back and broke it. *Id.* Mr. Jones was angry with Ms. Shields that night, but denies that he put his hands on her or grabbed her neck or put those bruises on her neck, but he admits that he shoved her and was tussling with her. *Id.* at 12.

Ms. Shields' chin bleeding may have happened when they were tussling over the phone. *Id.* at 13. Mr. Jones never stopped Ms. Shields from leaving. That night, she was "high as hell on meth," but he was not. *Id.* at 13-14. They had used methamphetamine, cocaine, and marijuana together previously, but not on that night. *Id.* at 14. Ms. Shields was not doing methamphetamine at his house that night, *id.* at 14, but that she was doing "meth" the day before when he first picked her up. *Id.* at 15.

Mr. Jones believes that he acted in self-defense against Ms. Shields because she was at his house "taking stuff from and putting it in a black trash bag" and she slapped him when he tried to

4

stop her. (Dkt. 78 at 6-7). Ms. Shields lied about everything, and that is why the jury found him not guilty of criminal confinement and strangulation. (Dkt. 76-11 at 9-10, 14).

Mr. Jones did not give a statement to Officer Granger before he was placed under arrest. However, when he and Officer Grant arrived at jail, Mr. Jones became irate and stated that he wanted Ms. Shields to be arrested. (Dkt. 78-1 at 2). Mr. Jones informed Officer Grant that his actions were in self-defense. *Id*. Officer Grant agreed to document Mr. Jones' side of the story. *Id*. On October 25, 2019, Officer Grant submitted the following supplement to Officer Granger's initial case report:

> David Michael Jones stated that on tonight's date, he and Kaylee Shields were inside the residence. He advised that she started to walk out of the residence with her purse and was trying to steal items from the trailer that did not belong to her. He advised that he confronted her, grabbed her purse, dumped it out and found several knick-knack items inside her purse. They became involved in an argument and Kylee smacked him over him accusing her of stealing items. He stated at this point they got into a tussle of him trying to keep her from stealing the items. He stated that he had the following injuries from her being the aggressor.

*Id*.

### iii. Interview of Ms. Shields

Officer Granger spoke with Ms. Shields and recorded her interview. (Dkt. 76-2 at 15; *see* Dkt. 76-6). During her interview, she stated that she was homeless and had just broken up with her boyfriend that day. (Dkt. 76-2 at 15; Dkt. 76-6 at 2-3). A friend arranged for her to stay with Mr. Jones so that she would not be on the street. (Dkt. 76-2 at 15; Dkt. 76-6 at 2-3). Shortly after arriving, Mr. Jones started making sexual advances toward her, which she declined several times. (Dkt. 76-2 at 15; Dkt. 76-6 at 3-4). She packed her things and told Mr. Jones she did not feel safe and was going to leave. (Dkt. 76-2 at 15; Dkt. 76-6 at 3-4). Mr. Jones became angry and yelled at her. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). Mr. Jones told her that if she left he would find her and kill her. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). When she went to leave, Mr. Jones restrained her by

pushing her back, grabbing her by the throat, and taking her down to the ground. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5).

When law enforcement arrived, Ms. Shields told officers that Mr. Jones strangled her to the point she could not breathe. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). She felt like she was going to lose consciousness but ultimately never did. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). When Mr. Jones stopped, Ms. Shields called 911 from her cell phone without him knowing it. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). Once Mr. Jones realized what she was doing, he grabbed her phone. (Dkt. 76-2 at 15; Dkt. 76-6 at 5-6). She kept yelling so 911 could hear her despite not having the phone in her hand. (Dkt. 76-2 at 15; Dkt. 76-6 at 5-6). Mr. Jones told the 911 dispatcher that everything was fine, and the police were not needed, and then he broke the phone. (Dkt. 76-2 at 15; Dkt. 76-6 at 5-6). When Ms. Shield saw the police cars, she yelled to them for help. (Dkt. 76-2 at 15; Dkt. 76-6 at 6).

### iv. Ms. Shields had visible injuries

Officer Granger observed a scrape on Ms. Shields' chin that was bleeding. (Dkt. 76-2 at 15). He also observed redness and defined marks on the front and sides of her neck. *Id.* She also had small impressions on the back of her neck that were small and circular and appeared to be from fingertips. *Id.* Officer Armstrong arrived on scene and took photographs of Ms. Shields' injuries. (Dkt. 76-4 at 13). Those photographs are consistent with Officer Granger's observations and Ms. Shields' account of what happened that night. (Dkt. 76-5) (Photographs of Kaylie Shields). Though she initially refused an ambulance, Ms. Shields later indicated that her throat was on fire and that she could barely swallow. (Dkt. 76-1 at 14). She did not have transportation, so Officer Granger transported her to the hospital. *Id.*

### v. Mr. Jones' arrest

Officer Granger informed Officer Grant that he intended to place Mr. Jones under arrest for criminal confinement, strangulation and interfering with the reporting of a crime. (Dkt. 76-1 at 14). After Officer Granger made the arrest, Officer Grant transported Mr. Jones to the Madison County Jail. *Id.* Officers Grant, Armstrong, and Smith were not involved in the decision to arrest or charge Mr. Jones. Dkt. 76-1; Dkt. 76-3 at 1; Dkt. 76-4 at 1.

Officer Armstrong and Officer Smith informed Mr. Jones that Officer Granger intended to place him under arrest and that he was going to jail. (Dkt. 76-11 at 19-20).

### C. Mr. Jones' criminal case

#### i. Charging Information

Officer Granger submitted his Affidavit for Probable Cause, (Dkt. 76-2 at 1-3), to Magistrate Jason Childers of the Madison County Circuit Court, who found probable cause for Mr. Jones' arrest (Dkt. 76-9). The Probable Cause affidavit included that upon arrival, he "heard a female yell over here and he located the female caller." *Id*. "A m/w subject walked out to Ofc. Grant who had arrived saying that the female was going crazy inside the trailer and had scratched him about his face." He observed that the female was visibly shaking and having trouble breathing.

*Id.* The female "advised that Jones had choked her" and he could easily see visible signs on her neck from being strangled. *Id*.

The State charged Mr. Jones with Count One, Criminal Confinement, a Level 5 Felony; Count Two, Strangulation, a Level 6 Felony; and Count Three, Interference with the Reporting of a Crime, a Class A Misdemeanor. Dkt. 76-7 (Charging Information).

### ii. Jury Verdict and Sentence

According to Mr. Jones, between getting out on bond and the criminal jury trial, he and Ms. Shields got back together romantically. (Dkt. 78 at 26).

A jury found Mr. Jones not guilty of both Criminal Confinement and Strangulation; but found him guilty only of Count Three-Interference with Reporting a Crime. (Dkt. 76-8 at 3). During his trial, Mr. Jones testified that Ms. Shields lied about everything and he believes that is why the jury found him not guilty of the criminal confinement and strangulation counts. (Dkt. 76-11 at 9-10, 14). Based on Mr. Jones' extensive criminal history, the trial court judge sentenced him to one year in the Madison County Jail. (Dkt. 76-10).

### III.   DISCUSSION

Mr. Jones initiated this action claiming that he was falsely arrested for the offenses of Criminal Confinement and Strangulation, in violation of his Fourth Amendment rights. Upon screening of the Complaint, the Court allowed Mr. Jones to proceed on his Fourth Amendment claims against Defendants limited specifically to the felony charges of which he was acquitted in his state court proceedings. (Dkt. 30 at 3) (citing *Thompson v. Clark*, 596 U.S. 36, 39 (2022) ("To maintain that Fourth Amendment claim under § 1983, a plaintiff such as Thompson must demonstrate, among other things, that he obtained a favorable termination of the underlying criminal prosecution.")). Mr. Jones' Fourth Amendment claims are specifically related to Count

One, Criminal Confinement, a Level 5 Felony; and Count Two, Strangulation, a Level 6 Felony; and the Court must evaluate Mr. Jones' claims "charge by charge." *Chiaverini v. City of Napoleon*, 144 S. Ct. 1745, 1750 (2024).

Defendants argue that summary judgment is appropriate for three reasons. First, there was probable cause to arrest Mr. Jones. Second, Officers Armstrong, Smith and Grant were not involved in the arrest. And third, Defendants are entitled to qualified immunity. The Court will first address whether Mr. Jones' arrest for Confinement was a Fourth Amendment violation, before turning to the arrest for Strangulation.

### A. Legal Standards

"There is a constitutional right not to be held in custody without probable cause," and that right is based in the Fourth Amendment to the United States Constitution. *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 670 (7th Cir. 2018); *Manuel v. City of Joliet Ill*, 580 U.S. 357. 364-369 (2017).

"Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *See Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013). Probable cause to arrest exists "when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." *Jump v. Vill. Of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022). "Probable cause does not require certainty"; instead, "[i]t is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (internal quotation marks omitted). Although the existence of probable cause is most often a jury question, the Court can make the determination on summary judgment when the underlying facts are undisputed. *Abbott v. Sangamon Cnty., Illinois*, 705 F.3d 706, 714 (7th Cir. 2013).

But the existence of probable cause for a different charge does not insulate a judicial officer from liability. *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 561 (2024) ("[T]he presence of probable cause for one charge does not automatically defeat a Fourth Amendment malicious-prosecution claim alleging the absence of probable cause for another charge.").

### B. Count One: Criminal Confinement

Mr. Jones was charged with, and a jury found him not guilty of, Count One, Criminal Confinement, a Level 5 Felony. Defendants argue that this shows there was probable cause to charge Mr. Jones with Criminal Confinement. (Dkt. 75 at 9-10). Mr. Jones' response does not specifically address probable cause as it relates to his Criminal Confinement charge. (*See* Dkt 78). Rather, Mr. Jones generally argues that Ms. Shields was stealing his personal property, she slapped him, and he used self-defense against her. *Id.* at 7-9.

Under Indiana law, "a person who knowingly or intentionally confines another person without the other person's consent commits criminal confinement." Criminal Confinement . *See* Ind. Code § 35-42-3-3.  The Court finds that Ms. Shields' statements to Defendants provided probable cause for the arrest. Ms. Shields told Officer Granger that a friend arranged for her to stay with Mr. Jones, and shortly after she arrived, he started making sexual advances towards her. (Dkt. 76-2 at 15; Dkt. 76-6 at 2-4). Mr. Jones' behavior made her feel unsafe, so she packed her things and told Mr. Jones she was going to leave. (Dkt. 76-2 at 15; Dkt. 76-6 at 3-4). But that made Mr. Jones become angry and yell at her—he told her that if she left he would find her and kill her. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). According to Ms. Shields, when she tried to leave, Mr. Jones restrained her by pushing her back, grabbing her by the throat, and taking her down to the ground where he strangled her to the point she couldn't breathe. Dkt. 76-2 at 15; Dkt. 76-6 at 4-5.

These statements alone would lead a reasonable officer to believe that Mr. Jones had

10

knowingly or intentionally confined Ms. Shields without her consent, a conclusion further bolstered by the other information that Defendants learned from (1) Ms. Shields' 911 call (where yelling and screaming could be heard by dispatch, and Mr. Jones got on the line and stated that everything was okay and hung up despite dispatch asking him several times to speak with Ms. Shields again), (Dkt. 76-1 at 13; Dkt. 76-2 at 2, 15,) (2) When the Defendants arrived at the scene, Ms. Shields was screaming and yelling that Mr. Jones had been hitting and choking her, (Dkt. 76-1 at 14), and (3) Defendants' observations of the scratches, redness, marks and fingertip impressions on Ms. Shields' neck (documented in photographs), (Dkt. 76-2 at 15; Dkt. 76-4 at 13; Dkt. 76-5).

Mr. Jones explains in his response that the scratches, redness, marks and fingertip impressions on Ms. Shields' neck were made by Ms. Shields' boyfriend, earlier that day. He argues that Defendants only listened to Ms. Shields' side of the story, and that Ms. Shields was stealing from him by taking his knick-knacks and putting them in a black trash bag, he yelled at her, she slapped him, so he used self-defense against her. (Dkt. 78 at 6-7). Mr. Jones acknowledges that Officer Grant heard his side of the story after he was arrested and taken to jail. He argues that "under police collective knowledge once an officer knows of information to a crime he is to share that knowledge with his fellow officer" and Grant did not tell Granger his information. *Id*. at 15. Mr. Jones further argues that had the officers included his version of the events in the probable cause affidavit, the magistrate would not have found probable cause to arrest him for anything. *Id.* at 16. In the same breath, Jones argues that Officer Granger did not bother to *ask* Officer Grant to *ask* Jones anything. *Id.* at 17 (emphasis added). Mr. Jones contradicts himself as to whether he told the officers his side of the story. *Id.* at 19 ("Granger never talked to Jones about what happen[ed] in his home . . .").

11

The majority of Mr. Jones' response rehashes the evidence designated by Defendants or retells his version of events. *See id*. Mr. Jones believes he was "arrested without due process of telling his side of the story" and believes the false arrest stems from his inability to tell his side of the story. *Id.* at 15. Mr. Jones' arguments are misguided. Courts assess probable cause based on the information available to officers at the time, not with the benefit of hindsight. *See, e.g., Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022). The Court cannot opine on whether the officer *should have* asked Mr. Jones for his side of the story. Mr. Jones was free to give his side of the story at any point: at his residence, in the patrol car, or when he was booked in Jail. In other words, Mr. Jones' after-the-fact opinion regarding the officers asking his side of the story is immaterial to whether Ms. Shields' statements during the 911 call, at the scene, and during her formal interview supported probable cause.

There is nothing in the record to suggest the officers should not have relied on Ms. Shields' statements as credible, especially considering they were consistent with the 911 call, her statements at the residence, and her injuries observed and documented via photograph, all of which supported probable cause for arrest.

### C.  Count Two: Strangulation

Mr. Jones was also charged with, and a jury found him not guilty of, Count Two, Strangulation, a Level 6 Felony. Defendants argue that despite the acquittal, there was probable cause to charge Mr. Jones with Strangulation. (Dkt. 75 at 10). As the Court noted above, Mr. Jones' response does not specifically address probable cause in relation to either charge, including his Strangulation charge. (*See* Dkt. 78). Rather, his response in opposition generally argues that he used self-defense against Ms. Shields because she was stealing things from his residence and putting them in a black trash bag, and she slapped him. *Id.* at 7-9.

Viewing the evidence in the light most favorable to Mr. Jones, and drawing all reasonable inferences in his favor—the Court accepts Mr. Jones' version of what happened. However, in determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer." *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008.)

Defendants argue they had probable cause to arrest Mr. Jones for Strangulation under Indiana law. *See* Ind. Code § 35-42-2-9I(1) ("A person who, in a rude, angry, or insolent manner, knowingly or intentionally … applies pressure to the throat or neck of another person … in a manner that impedes the normal breathing or the blood circulation of the other person commits strangulation.").  As noted above, probable cause does not require certainty, rather it relies on the officer's common-sense judgment based on the totality of the circumstances. Ms. Shields exited the residence hollering and screaming that Mr. Jones grabbed her by the throat, threw her to the ground, and strangled her to the point where she could no longer breathe. (Dkt. 76-2 at 15; Dkt. 76-6 at 4-5). These statements alone would suggest to a reasonable officer that Mr. Jones, in an angry manner, knowingly or intentionally applied pressure to her throat or neck to impede her breathing.

Mr. Jones has not designated any evidence to show that at the time of his arrest, Defendants were aware of his version of the events—that Ms. Shields' boyfriend had strangled her earlier in the day and that his actions were in self-defense after she slapped him. Mr. Jones' statement to Officer Granger at the jail does not mention that Ms. Shields' boyfriend had strangled her earlier that day.

The designated evidence supports that Defendants had probable cause to arrest Mr. Jones for strangulation.  This conclusion is supported by Defendants' observations at the scene. First, upon arrival Defendants heard Ms. Shields yelling and screaming: "Over here, I need help. He's

13

been hitting me and choking me[.]" (Dkt. 76-1 at 14). Then, Defendants observed the injuries Ms. Shields had recently sustained, which were consistent with her statements. Defendants documented these observations by taking photographs of her injuries, which depicted scratches and redness, along with defined marks on the front and sides of her neck, and small fingertip-like impressions on the back of her neck. (Dkt. 76-2 at 15; Dkt. 76-4 at 13; Dkt. 76-5).

While Mr. Jones argues that the Defendants did not listen to his side of the story, Ms. Shields' statement proved credible, especially given the visible injuries on her neck and throat. The undisputed facts known to the Defendants unquestionably provided probable cause to arrest Mr. Jones for strangulation under Indiana law. And as Defendants point out, even if Shields was lying, and even if that was the reason he was found not guilty of those charges, Defendants still acted in good faith and reasonably relied upon the evidence they had before them at the time of Plaintiff's arrest in making a probable cause determination.

**D. Qualified Immunity**

Defendants also assert that they are entitled to qualified immunity, which protects government officials from liability "when they act in a manner that they reasonably believe to be lawful." *Gonzalez v. City of Elgin,* 578 F.3d 526, 540 (7th Cir.2009). Put another way, government officials performing discretionary functions are entitled to qualified immunity if their conduct could reasonably have been thought consistent with the rights they are alleged to have violated. *Borello v. Allison,* 446 F.3d 742, 746 (7th Cir.2006) (citing *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1013 (7th Cir.2006)).

Qualified immunity not only protects a defendant from liability, but also from the burden of standing trial. *Id.* As such, "courts should determine as early on in the proceedings as possible whether a defendant is entitled to qualified immunity." *Id.* When presented with a qualified

14

immunity defense, the court must first "(1) determine whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) if so, determine whether that right was clearly established at the time of the alleged violation." *Sparing v. Village of Olympia Fields,* 266 F.3d 685, 688 (7th Cir.2001) (*citing Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

Although qualified immunity is an affirmative defense, the burden of defeating an assertion of qualified immunity rests with the plaintiff. *Id.* (*citing Spiegel v. Cortese,* 196 F.3d 717 (7th Cir.1999)). Accordingly, Mr. Jones bears the burden of showing that the constitutional right allegedly violated was clearly established before the Defendants acted by offering either a closely analogous case or evidence that the defendant's conduct so patently violates the constitutional right that reasonable officials would know without guidance from the courts. *Gossmeyer v. McDonald,* 128 F.3d 481, 496 (7th Cir.1997) (*citing Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir.1993)).

Defendants point out that in false-arrest cases, qualified immunity provides officers with an extra layer of protection, because even if a jury can find lack of probable cause on a given set of facts, the question still is whether a reasonable officer would have mistakenly believed that the arrest lacked probable cause. *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001). If an officer had even "arguable probable cause" to arrest the plaintiff, then qualified immunity applies. *Id*.

Here, Ms. Shields' statements—that Mr. Jones hit her and told her he would kill her if she left, physically stopped her from leaving, grabbed her throat, pinned her to the ground, and choked her until she could not breathe and almost passed out—as well as her appearance, provided sufficient "arguable probable cause" to arrest the Mr. Jones.

15

## IV.   CONCLUSION

For the reasons explained in this Order, the Defendant's Motion for Summary Judgment, Dkt. [74], is **GRANTED.** Mr. Jones' Motion to Appoint Counsel, Dkt. [81]; and Defendants' Motion for Continuance, Dkt. [82] and Motion for Oral Argument, Dkt. [83], are **DENIED** as moot. The February 11, 2026 final pretrial conference and March 9, 2026 trial date are **VACATED**.

Final judgment shall issue by separate entry.

**IT IS SO ORDERED.**

Date: 1/20/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

DAVID MICHAEL JONES
850168
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel